UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| PAUL FURTADO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | NO. 10-11231-WGY |
| STANDARD PARKING CORPORATION, ) | |
| KENNETH SANTIAGO, and WILLIAM ) | |
| HAJJAR, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM AND ORDER

YOUNG, D.J.                                    October 27, 2011

## I.    INTRODUCTION

Paul Furtado ("Furtado") alleges that his employer, Standard Parking Corporation ("Standard Parking"), and supervisors, Kenneth Santiago ("Santiago") and William Hajjar ("Hajjar") (collectively the "Defendants"), violated his rights under the Americans with Disabilities Act ("ADA"), the Family and Medical Leave Act ("FMLA"), and the Massachusetts Anti-Discrimination Statute by failing to accommodate his psychological disabilities and by firing him because of his disability and because he requested leave under the FMLA.  The Defendants move for summary judgment.

1

## A.    Procedural Posture

Furtado filed his complaint on July 22, 2010.  Compl., ECF No. 1.  The Defendants filed the instant motion for summary judgment on June 15, 2011.  Defs.' Mot. Summ. J., ECF No. 15. The Court heard oral arguments on July 13, 2011, and took the matter under advisement.

## B.   Facts

This recital recounts the undisputed facts and the disputed facts in the light most favorable to Furtado, the nonmoving party.[1]

Furtado worked for Standard Parking from September 9, 1999, until July 23, 2008, when he was terminated.  Compl. ¶ 10. Standard Parking provides parking and transportation services to the Massachusetts Institute of Technology ("MIT").  Defs.' Statement Undisputed Facts ("Defs.' Facts") ¶ 8, ECF No. 17.[2] One of the services offered by Standard Parking is the "Saferide Program," a nightly shuttle service for members of the MIT community.  Id.  Furtado began as a shuttle driver for the Saferide Program in 1999 and over his years of employment was promoted to "on call" supervisor, supervisor, assistant manager, and ultimately, in 2006, manager of the Saferide Program.  Compl.

---

[1] Because the timing of certain events are relevant to the Court's analysis, the facts are presented chronologically.

[2] Citations, as here, to the Defendants' Statement of Facts refer only to those facts which are not disputed by Furtado.

2

¶ 11.  As a manager, Furtado's duties included tracking drivers and other employees, overseeing nighttime operations (Saferide managers worked only in the evening because the Saferide Program did not operate during the day), handling dispatch, and dealing with situations such as on-site emergencies and accidents.  Id. ¶¶ 12, 18; Defs.' Facts ¶ 15.  At all relevant times, Furtado's direct supervisor was Santiago.  Defs.' Facts ¶ 16.  Santiago reported to Hajjar, the Senior Manager of the MIT branch of Standard Parking.  Id. ¶ 17.  Santiago and Furtado were close friends, having grown up together, and Santiago even viewed Furtado "like a sibling."  Santiago Dep. 77:14, ECF No 18-8; Compl. ¶ 28.

In 2001, Furtado began suffering from verbal, emotional, and physical abuse from his then girlfriend.  Furtado Aff. ¶ 1, ECF No. 22-1.  In July 2005, Furtado found his girlfriend, who was pregnant with the couple's second child, in the bathroom of their apartment with self-inflicted throat and wrist wounds.  Id. ¶ 2.  Furtado initiated custody proceedings and in 2007 was awarded sole legal custody of the couple's two sons.  Id. ¶ 3.

On several occasions beginning in 2007, Furtado told Santiago and Hajjar about the issues he was having with his girlfriend, his difficulty in obtaining custody of his children, and the emotional toll these events were taking on him.  Id. ¶ 3.  He told Santiago and Hajjar that he was "losing it" and

experiencing "physical shakes," anxiety, sleeplessness, fear of leaving his home, and depression.  Id. at ¶¶ 3, 7-9; Furtado Dep. 45:7, ECF No. 18-6.

Because of these emotional issues and to be able to see his sons more, Furtado made repeated requests to move to a day shift. Furtado Aff. ¶ 4.  These requests began around July 2007. Furtado Dep. 43:9-14.  Santiago explained to Furtado that Saferide managers did not work during the day, and thus there were no day positions available, but told Furtado that he would look into whether other options existed for modifying Furtado's work schedule.  Furtado Aff. ¶ 5; Santiago Dep. 80:3-6.  Furtado claims that he was willing to take a demotion or reduction in pay so that he could work a day shift but that Santiago never came back to him with any options.  Furtado Aff. ¶ 6.  Furtado never changed positions.

In January 2008, Furtado's work performance as a manager during the prior calendar year was evaluated.  Defs.' Facts ¶ 33. He received an overall rating of "below expectations."  Id.; 2007 Evaluation 5, ECF No. 18-10.  Santiago and Hajjar noted that Furtado was "not readily motivated on projects or his daily duties," that he "need[ed] to work on getting his reports in on time," and that he "ha[d] not been managing effectively due to his lack of interest or caring in his position."  2007 Evaluation 2, 3.  The evaluation also noted that "[i]n past years [Furtado]

4

ha[d] been a great supervisor.  This year [2007] seems to have
been a struggle with him between his job and personal life."  Id.
at 2.  Furtado received and signed off on this performance
review.  Id. at 5.

On April 8, 2008, Furtado was issued a written warning for
"Substandard Work" and "Carelessness," which noted that the day
before he had not inspected a bus that had vomit inside it when
it returned from its route, and had left another bus in an
improper location.  Employee Discipline Report, April 8, 2008,
ECF No. 18-11.  This forced Standard Parking to operate its
shuttle schedule without the full fleet of buses the next day.
Defs.' Facts ¶ 38.  On May 12, 2008, Furtado was issued another
initial warning for "Substandard Work" and "Procedure/Rule
Violation" for failing to check the buses at the end of his
shift, leading the batteries in two of the buses to die.
Employee Disciplinary Report, May 12, 2008, ECF No. 18-12.  This
initial warning also noted that Furtado, without notifying
Santiago or Hajjar, had another employee close the parking
facility and failed to fill out reports for the shuttle routes
that weekend.  Id.  Furtado was cautioned that another warning
would result in suspension.  Id.

In May 2008, Furtado commenced psychological treatment for
depression, anxiety, and post-traumatic stress disorder with Dan
Pollets, Ph.D ("Dr. Pollets").  Furtado Aff. ¶ 10; Compl. ¶ 27;

Defs.' Facts ¶¶ 84-85; Dr. Pollets Referral Letter, ECF 22-5.
This fact was not disclosed to Santiago or Hajjar at the time.
Defs.' Facts ¶ 86.

As a manager of the Saferide Program, Furtado received a
Nextel cellular telephone from MIT.  Furtado Aff. ¶ 18; Defs.'
Facts ¶ 25.  The cell phone enabled Furtado to communicate with
the drivers in case of mechanical problems, accidents, or other
issues.  Defs.' Facts ¶¶ 26-27; Defs.' Mem. L. Supp. Defs.' Mot.
Summ. J. ("Defs.' Mem.") 4, ECF No. 16.  On June 20, 2008, Larry
Brutti ("Brutti"), an MIT employee, informed Santiago that the
charge for Furtado's Nextel phone for the billing cycle from May
4 to June 3, 2008, was $527.03 – over $450 more than the typical
bill.  Defs.' Facts ¶ 46-48; Nextel Bill, June 7, 2008, ECF No.
18-13.  The majority of the charges were for phone calls or text
messages to Furtado's then girlfriend, Kathleen Taylor
("Taylor").  Defs.' Facts ¶¶ 52-53.  Of the over sixty-three
hours of calls or texts to Taylor, nearly forty-one hours were
made between 4:30 p.m. and 4:30 a.m., when Furtado was at work
for Standard Parking.  Id. ¶¶ 53-54.

Brutti was "ticked off" about the excessive charges and
asked Santiago to address them with Furtado.  Id. ¶¶ 49, 55;
Santiago Dep. 51:1-2.  Santiago responded by suspending Furtado
for three days (June 21 to June 23, 2008).  Employee Disciplinary
Report, June 20, 2008, ECF No. 18-15.  Santiago also asked

Furtado to pay back the excessive charges, and on June 28, 2008, Furtado signed an agreement to pay $40 per month until the charges were repaid.  Repayment Agreement, June 28, 2008, ECF No. 18-16.

Also on June 28, 2008, after Furtado had returned to work from his suspension, Santiago gave him an "Intent to Improve" memorandum which stated that if Furtado's performance did not improve over the next ninety days, "further action [would] be taken, up to and including termination from Standard Parking." Intent to Improve Mem., June 28, 2008, ECF No. 18-7; Defs.' Facts ¶ 59.  This essentially created a 90-day probationary period.

On July 6, 2008, Furtado met with Mark Eisenberg, M.D. ("Dr. Eisenberg") at Massachusetts General Hospital Charlestown HealthCare Center upon referral from Dr. Pollets.  Certification Health Care Provider, July 6, 2008, ECF No. 22-6.  Dr. Eisenberg completed a "Certification of Health Care Provider" form pursuant to the FMLA, stating that Furtado's psychological issues prevented him from working and that he would benefit from a three-month leave to receive intensive treatment.  Id. at 1-2. On July 7 or July 8, 2008, Furtado showed Santiago the FMLA form completed by Dr. Eisenberg, as well as a letter from Dr. Pollets detailing his psychological diagnoses, and requested to take leave from work.  Furtado Aff. ¶ 11.  This was the first time that Furtado had shown any of the Defendants documentation

7

regarding his mental health condition.  Defs.' Facts ¶ 86.

Furtado did not complete a Standard Parking-provided "Request for

Family Medical Leave" form pursuant to the FMLA, but claims that

no one ever told him he had to do so.  Furtado's Aff. ¶ 12;

Defs.' Facts ¶¶ 87-90.  Santiago suggested that Furtado take a

two-week paid vacation while he looked into Furtado's options

under the FMLA.  Defs.' Facts ¶ 91; Compl. ¶ 32.  Furtado took

this vacation beginning July 13, 2008.  Compl. ¶ 33.

On July 21, 2008, Brutti informed Santiago that Furtado's

Nextel bill was, again, significantly higher than average.

Defs.' Facts ¶¶ 60-61.  For the billing cycle from June 4 to July

3, 2008 (the billing cycle immediately following the first

billing cycle of excessive charges), the total amount due for

Furtado's phone was $442.74.  Id.; Nextel Bill, July 7, 2008, ECF

No. 18-17.  This bill included over ten hours of calls and texts

to Taylor over the three days that Furtado was suspended for

misusing his phone, and nine hours of similar charges for the

five-day period between when Furtado was placed on probation and

when the billing cycle ended.  Defs.' Facts ¶¶ 62, 63.  Brutti

told Santiago that "[w]hatever you're doing to curb this behavior

is not working," and Hajjar told Santiago that Furtado's phone

usage was putting a strain on Standard Parking's relationship

with its client, MIT.  Santiago Dep. 142:23 to 143:12.

On July 23, 2008, the decision was made to terminate

Furtado's employment.  Employee Disciplinary Report, July 23,
2008, ECF No. 18-18.  The disciplinary report noted that
Furtado's employment was terminated "[a]s a result of his misuse
of MIT's cell phone and overages."  Id.  On July 24, 2008,
Santiago informed Furtado, who was still on his two-week
vacation, of his termination for overusing the MIT phone.
Furtado Dep. 108:3-8, ECF No. 18-6.

On July 30, 2008, Furtado filed a complaint of
discrimination with the Massachusetts Commission Against
Discrimination (the "MCAD"), alleging that he was discriminated
against based on his psychological disabilities.  MCAD
Investigative Disposition 1, ECF No. 18-3.  On December 31, 2009,
the MCAD issued a finding of "Lack of Probable Cause" because
Furtado had failed to show that his termination was due to his
disability.  Id. at 4-5.  Furtado appealed this finding, and a
preliminary hearing was held on February 24, 2010.  MCAD Letter,
May 28, 2010, ECF No. 18-4.  On May 28, 2010, an MCAD
investigating commissioner affirmed the "Lack of Probable Cause"
finding.  Id.

Furtado continues to have trouble sleeping, leaving his
house, dealing with anxiety, working, and performing many day-to-
day activities and is receiving psychological and psychiatric
treatment.  Furtado Aff. ¶¶ 20-21.  Since his date of
termination, Furtado has been unable to find gainful employment

and has been denied unemployment benefits.  Compl. ¶ 36.

## II.  ANALYSIS

### A. Legal Standard

Summary judgment is warranted when the facts, properly supported by the record and taken in the light most favorable to the non-moving party, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" when it "might affect the outcome of the suit under the governing law . . . ."  <u>Anderson</u> v. <u>Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>

To defeat a motion for summary judgment, the nonmoving party is required to produce "specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue . . . . [C]onclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact."  <u>Triangle Trading Co., Inc.</u> v. <u>Robroy Indus., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1985) (internal citations and quotations omitted).  The Court must, however, "disregard all evidence favorable to the moving party that the jury is not required to believe."  <u>Reeves</u> v. <u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000).

**B. Claims Under the Americans with Disabilities Act and Massachusetts General Laws chapter 151B**

**1.   Disability Discrimination Claims**

In his first and seventh claims, Furtado alleges that Standard Parking discriminated against him on the basis of his disability, in violation of the Americans with Disabilities Act ("ADA") and Massachusetts General Laws chapter 151B, by terminating his employment.[3]  Compl. ¶¶ 38-43, 73-78.

To defeat the Defendants' motion for summary judgment, Furtado must withstand the three-part, burden-shifting framework first established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which is used to evaluate claims of discriminatory treatment.[4]  See Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3 (2003).  First, Furtado must establish a prima facie case by demonstrating that: (1) he suffers from a disability (as defined

---

[3] The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a); see Freadman v. Metropolitan Prop. & Cas. Ins. Co., 484 F.3d 91, 99 (1st Cir. 2007).  Similarly, Massachusetts General Laws chapter 151B, section 4(16) prohibits an employer from discriminating against a person on the basis of handicap.

[4] The application of the McDonnell-Douglas framework to claims of disability discrimination under the ADA was confirmed in Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999).  State discrimination law, under Massachusetts General Laws chapter 151B, is in accord with the federal standards.  Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 & n.2 (1st Cir. 2005).

by the ADA or Massachusetts General Laws chapter 151B); (2) he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation; and (3) that Standard Parking took an adverse employment action against him at least in part because of his disability.[5]  See Freadman v. Metropolitan Prop. & Cas. Ins. Co., 484 F.3d 91, 100 n.7 (1st Cir. 2007).  If Furtado can establish a prima facie case, the burden of production (but not the burden of persuasion) then shifts to Standard Parking to articulate a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas, 411 U.S. at 802.  This is another way of saying that proof of the basic facts of the prima facie case creates a presumption of discrimination, and it is up to the defendant to rebut the presumption by advancing a legitimate, non-discriminatory reason for the adverse job action.  If such a showing is made by Standard Parking, then the presumption drops out of the case, leaving Furtado to prove by a preponderance of the evidence that Standard Parking's stated reason was merely a pretext for disability discrimination.  Id. at 804-05; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 517-18 (1993).  The

---

[5] Under Massachusetts law, to establish a prima facie case for discrimination on the basis of handicap, Furtado must show that: (1) he is handicapped; (2) he is a qualified handicapped person; and (3) that he was subject to an adverse action because of his handicap.  Everett v. 357 Corp., 453 Mass. 585, 611 n.33 (2009).

ultimate burden of persuading the trier of fact that Standard Parking intentionally discriminated against him remains with Furtado at all times.  See Reeves, 530 U.S. at 143.

### a.   Prima Facie Case

The parties do not contest that Furtado has set forth a prima facie case of employment discrimination under the ADA. Standard Parking does, however, argue that Furtado does not establish a prima facie case under Massachusetts General Laws chapter 151B because he is not a "qualified handicapped person." Chapter 151B defines "qualified handicapped person" as "a handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with reasonable accommodation of his handicap."  Mass. Gen. Laws ch. 151B, § 1(16).  In Garrity v. United Airlines, Inc., 421 Mass. 55 (1995), the Supreme Judicial Court stated that "a handicapped employee who engages in conduct significantly inimical to the interests of his employer and in violation of the employer's rules is not . . . . a 'qualified handicapped person' within the meaning of [Massachusetts General Laws chapter] 151B and therefore is not entitled to the protection of that statute." Id. at 63.

The Defendants contend that Furtado's excessive and personal use of his company-issued cell phone, especially after having

13

been suspended and placed on probation for this very same misconduct, was in violation of Standard Parking's policy, caused conflict with Standard Parking's client, MIT, and created a safety risk for the Saferide drivers who could not reach Furtado in the event of an emergency.  Defs.' Mem. 10.  Although it is uncontested that Furtado was a handicapped person under Massachusetts law, this law does not shield him from the consequences of his misconduct.  Handicapped individuals must obey the same rules of conduct as other employees, and "when a handicapped person engages in misconduct that makes him or her unable to perform the essential functions of the job, the person is not a qualified handicapped individual."  LaRosa v. United Parcel Serv., Inc., 23 F. Supp. 2d 136, 146 (D. Mass. 1998). That Furtado was suffering from psychological disabilities does not give him a "free pass" to engage in clear misconduct.  As such, the Court rules that Furtado has failed to show that he is a qualified handicapped person, and thus he has not established a prima facie case of disability discrimination under Massachusetts General Laws chapter 151B.  Although this ends the inquiry into Furtado's state law discrimination claim, the Court must continue with the tripartite analysis for Furtado's ADA claim.[6]

---

[6] As discussed below, though, even if Furtado were considered to be a qualified handicapped person under Massachusetts law, his state law claim would nonetheless fail on pretext.

### b.   Nondiscriminatory Reason for Dismissal

The parties do not contest that Standard Parking has met its burden of articulating a nondiscriminatory reason for dismissal. Standard Parking has never deviated from its explanation that Furtado was fired for abusing his company-issued cell phone. This was not only in violation of the company's policy with respect to personal telephone calls but also potentially dangerous because, while Furtado was on the phone with his girlfriend, Saferide drivers would have been unable to reach him in case of an emergency.  See Defs.' Mem. 10.  Because Standard Parking has proffered a nondiscriminatory reason for dismissing Furtado, the presumption of discrimination raised by Furtado's prima facie case vanishes.

### c.   Pretext

The main focus of the parties' dispute, and thus the Court's inquiry, is whether Standard Parking's stated reason was but a pretext for disability discrimination.  See Hebert v. Mohawk Rubber Co., 872 F.2d 1104, 1106 (1st Cir. 1989).  In this final round of the analysis, it is up to Furtado, unassisted by the original presumption, to show that Standard Parking's reason was advanced merely to disguise its real reason for terminating Furtado's employment, his disability.  Freeman v. Package Mach. Co., 865 F.2d 1331, 1336 (1st Cir. 1988).

"In assessing pretext, the court must look at the total

15

package of proof offered by the plaintiff." Benoit v. Technical
Mfg. Corp., 331 F.3d 166, 174 (1st Cir. 2003).  Furtado "has to
clear two significant hurdles before he is able to show pretext."
Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir.
2005).  First, he must refute the clear evidence put forward by
Standard Parking showing that it was cell phone overuse, and not
disability, that constituted the real reason for his termination.
Id.  Second, he must advance evidence of his own showing that
Standard Parking's asserted reason was a pretext hiding
discrimination.  Id.; see also Medina-Munoz v. R.J. Reynolds
Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990) (stating that the
plaintiff must "elucidate specific facts which would enable a
jury to find that the reason given was not only a sham, but a
sham intended to cover up the employer's real motive").

     In support of their claim that Furtado was fired for his
excessive cell phone charges, the Defendants present the
testimonies of Santiago and Furtado, as well as the June and July
cell phone invoices showing the high number of calls and texts to
Taylor.  In an attempt to refute this evidence, Furtado argues
that a "similarly situated" employee (namely, his replacement as
a Saferide manager, Ghislaine Firmin ("Firmin")), also
significantly overused her cell phone in her very first month on
the job and yet is still employed by Standard Parking.  See Mem.
Supp. Pl.'s Opp'n Defs.' Mot. Summ. J. ("Pl.'s Mem.") 10-11, ECF

No. 19.  In support of this proposition, Furtado submits portions
of the Nextel bill for the billing cycle from July 4 to August 3,
2008, for the phone assigned to Firmin, showing that the phone
was used for 3,895 minutes, well in excess of the 1,000 minutes
allotted to the plan.  Portion of Nextel Bill, Aug. 7, 2008, ECF
No 23-4.  This evidence and the associated arguments are, at
best, a red herring and, at worst, a false and misleading
representation to the Court.  The vast majority of the calls
Furtado attempts to attribute to Firmin were in fact still his
own calls to Taylor.

Appended to their reply memorandum, the Defendants provide a
copy of the <u>complete</u> Nextel bill for the billing cycle from July
4 to August 3, 2008, showing the telephone numbers called and
call durations.  Complete Nextel Bill, Aug. 7, 2008, ECF No. 25-
1.  The Defendants also provide a supplemental affidavit of
Santiago, in which he attests that the telephone assigned to
Furtado was turned over to Firmin on July 27, 2008, after
Furtado's termination.  Supp. Santiago Aff. ¶ 3, ECF No. 26.  An
analysis of the individual calls on this invoice reveals that
over 3,700 of the 3,895 minutes were Furtado's calls from the
period of July 4 to July 27, 2008, before the transfer of the
phone to Firmin.  Complete Nextel Bill, Aug. 7, 2008.  What is
more, over 3,000 of these minutes were calls to or from the
telephone numbers of Furtado's girlfriend, Taylor.  See id.  In

17

short, Furtado's only purported evidence that Firmin, a similarly situated employee, overused her cell phone instead demonstrates that Furtado himself was still overusing his phone before he was terminated.  Because Furtado has not established that a similarly situated employee was treated differently, and because the record reflects his repeated misuse of the company cell phone and otherwise poor job performance, Furtado has failed to raise a genuine factual dispute as to pretext.  Summary judgment therefore properly is entered for the Defendants on Furtado's first and seventh claims for disability discrimination.

### 2.   Retaliation Claims

In his third and eleventh claims, Furtado alleges that the Defendants retaliated against him for requesting a reasonable accommodation, in violation of the ADA and Massachusetts General Laws chapter 151B.[7]  Compl. ¶¶ 52-55, 93-95.

A claim for retaliation is distinct from one for discrimination, and a plaintiff may prevail on retaliation even if his underlying claim for discrimination fails.  Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997).  To

---

[7] The retaliatory provision of the ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . ."  42. U.S.C. § 12203(a).  Section 4(4) of chapter 151B makes it unlawful for an employer to discriminate against "any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any [grievance] proceeding . . . ."  Mass. Gen. Laws ch. 151B, § 4(4).

establish a claim of retaliation, Furtado must show that: (1) he engaged in protected conduct; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action. Freadman, 484 F.3d at 106.

The parties agree that Furtado has sufficiently alleged the first two elements. The contested issue is whether there is any causal connection between Furtado's request to move to a day shift and his ultimate termination. See Defs.' Mem 9.

Causation may be shown, among other ways, by demonstrating that there is a "close temporal proximity" between the employer's awareness of the protected activity and the adverse employment action. The parties do not dispute that Furtado began requesting a move to a day shift in or around July 2007 and that he was terminated in July 2008, over a year later. See Furtado Dep. 43:9-10. This year-long delay, the Defendants contend, is too extended to establish a causal connection. Defs.' Mem. 9-10. The Court notes without ruling that a delay of a year between a request for accommodation and adverse employment action likely would be insufficient to establish a causal connection. See Moron-Barradas v. Department of Educ. of P.R., 488 F.3d 472, 481 (1st Cir. 2007) (holding that an eight-month lapse between the protected activity and alleged retaliation was insufficient to establish temporal proximity). Furtado argues, however, that the

19

causal connection element of the test is met because he did not make a singular request back in 2007, but rather made continued requests throughout 2007 and into 2008, bringing his requests closer in proximity to his termination.   In his deposition, when questioned about when he asked to change shifts, Furtado testified that he was "always asking" to be moved to a day shift. Furtado Dep. 43:19.

There is thus a factual dispute as to when, and how frequently, Furtado asked to move to the day shift.   This dispute is ultimately immaterial, however, because the undisputed intervening acts of misconduct sever the causal connection (if any) between the protected conduct and the adverse employment decision.   See Hankins v. AirTran Airways, Inc., 237 Fed. App'x 513, 521 (11th Cir. 2007); see also Whatley v. Metropolitan Atlanta Rapid Transit Auth., 632 F.2d 1325, 1329 (5th Cir. 1980) (ruling that, even though the plaintiff filed a discrimination charge shortly before being terminated, the dismissal actually was caused by "a culmination of problems" with the plaintiff's job performance).   "[C]lose temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity."   Hankins, 237 Fed. App'x at 520.   Even assuming a close temporal relationship between Furtado's requests to move to a day shift and his ultimate termination, the

undisputed evidence of record establishes that Furtado's cell phone misuse, as well as his other disciplinary issues, broke whatever causal chain may have been presumed.  Accordingly, Furtado's prima facie case of retaliation fails on causation grounds, and summary judgment properly is entered for the Defendants on counts three and eleven.

### 3. Failure to Accommodate

In his second and eighth counts Furtado alleges that Standard Parking violated the ADA and Massachusetts General Laws chapter 151B by failing to provide him with a reasonable accommodation.  Compl. ¶¶ 44-51, 79-86.

### a. Jurisdiction

As a threshold matter, the Defendants argue that this Court does not have jurisdiction to adjudicate Furtado's claims for failure to accommodate because Furtado did not bring these claims before the MCAD.  See Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 531 n.11 (2001) ("A claim cannot be brought alleging discrimination under G.L. c. 151B, unless it is preceded by the filing of a complaint of unlawful discrimination with the MCAD within six months of the alleged act or acts of discrimination."); Everett, 453 Mass. at 602 ("This generally means that a plaintiff cannot add additional claims . . . that are outside the scope of the MCAD charge . . . ."); Windross v. Village Auto. Grp., Inc., 71 Mass. App. Ct. 861, 864 (2008)

(holding that the purposes of Massachusetts General Laws chapter 151B "would be frustrated if the claimant were permitted to allege one thing in the MCAD complaint only to allege something entirely different in the ensuing civil action . . . .").

Furtado argues that jurisdiction is proper because his complaint of disability discrimination (originally filed without the advice of counsel) was sufficient to give the MCAD an opportunity to investigate and put the Defendants on notice of a failure to accommodate claim arising out of the underlying facts. See Pl.'s Mem. 19.  Furtado is seeking to invoke the so-called "scope of the investigation" rule, which allows "a claim that is not explicitly stated in the administrative complaint [to] be asserted in the subsequent [court] action so long as it is based on the acts of discrimination that the MCAD investigation could reasonably be expected to uncover."  Everett, 453 Mass. at 603 (quoting Windross, 71 Mass. App. Ct. at 864-65).

The question, then, is whether Furtado's administratively filed charges of discrimination reasonably could have been expected to give rise to a failure to accommodate claim.  See Pelletier v. Town of Somerset, 458 Mass. 504, 515 (2010) ("Whether elements of a claim fall within the scope of an MCAD investigation presents a question of law for judicial determination.").  In considering the scope of the investigation, it is important to remember the purposes of the administrative

22

filing requirement: "1) to provide the MCAD with an opportunity

to investigate and conciliate the claim of discrimination; and

(2) to provide notice to the defendant of potential liability."

<u>Cuddyer</u>, 434 Mass. at 531.

Furtado's original complaint was filed pro se.[8]   His

complaint focused exclusively on his termination and the events

---

[8] Furtado urges the Court to grant him latitude in consideration of his failure to accommodate claim because he filed his complaint pro se mere days after being terminated from Standard Parking.  <u>See</u> Pl.'s Mem. 18.  Furtado correctly notes that in cases where the former employee acts pro se, the charges are "liberally construed in order to afford the complainant the benefit of any reasonable doubt."  <u>Lattimore</u> v. <u>Polaroid Corp.</u>, 99 F.3d 456, 464 (1st Cir. 1996) (citing <u>Westphal</u> v. <u>Waukesha Dresser/Waukesha Engine Div.</u>, 855 F.Supp. 1009, 1015 (E.D. Wis. 1994); <u>Pickney</u> v. <u>American Dist. Tel. Co.</u>, 568 F. Supp. 687, 690 (E.D. Ark. 1983)).  In this case, however, the Court notes that Furtado is not entitled to the typical leeway.  Furtado could have brought additional charges once he was represented by counsel by amending his MCAD complaint to "allege[] additional acts constituting unlawful discriminatory practices related to or arising out of the subject matter of the original complaint."  <u>Everett</u>, 453 Mass. at 602 (quoting 804 Mass. Code Regs. § 1.03(5) (1993)).  Although his complaint was filed pro se on July 30, 2008, Furtado had obtained the assistance of Attorney Robert Costello by the time he filed his rebuttal on October 31, 2008. Furtado, through his attorney, not only failed to amend but expressly disclaimed any charges of failure to accommodate.  <u>See</u> Pl.'s Rebuttal to Defs.' Position Statement, Addressed to MCAD 7 (stating to the MCAD in writing that Furtado "has not made a formal claim regarding the lack of a reasonable accommodation").
Pro se claimants are not relieved of their duty to meet the general procedural requirements established by law.  <u>United States</u> v. <u>Michaud</u>, 925 F.2d 37, 41 (1st Cir. 1991).  "Even a pro se complainant is required to describe the essential nature of the claim and to identify the core facts on which it rests."  <u>Lattimore</u>, 99 F.3d at 464.  Even after he obtained an attorney, Furtado did not state the facts essential to a reasonable accommodation claim and therefore there is no reason to afford him additional indulgences.

leading up to it, all of which occurred in mid-2008.  See MCAD
Compl., ECF No. 18-1.  Furtado's rebuttal, filed with the
assistance of his attorney, continued to focus on his termination
"following formal notice of his handicap" to Standard Parking in
July 2008.  Pl.'s Rebuttal Defs.' Position Statement ("Rebuttal")
1, ECF 18-2.  In his rebuttal, Furtado did mention that he
earlier "had made requests for accommodations which would allow
him to deal with his anxiety, at one time asking for an
alternative schedule that would enable him to work days during
the week."  Id. at 2.  Furtado further claimed that "his requests
were not accommodated."  Id.  These allegations, however, appear
to have been included in his rebuttal only to support the
contention that Standard Parking had knowledge of his disability
and ought not have fired him for "minor" job violations.  Id. at
7.  Because Furtado's presentation to the MCAD emphasized almost
exclusively the events in mid-2008 when he revealed his
disability and was thereafter terminated, it would be
unreasonable to expect that the MCAD, in the course of its
investigation, would have uncovered facts related to the
reasonable accommodation requests Furtado claims to have made in
2007 and early 2008.

Furtado's termination-focused disability discrimination
claim and his reasonable accommodation claim are based upon sets
of facts that are distinct both substantively and temporally.

See <u>Lattimore</u>, 99 F.3d at 465.

> An investigation is a systematic inquiry into a particular matter.  When it is launched in response to a charge of employment discrimination, the direction and scope of the investigation are guided by the allegations contained in the charge.  Although an investigation is not strictly confined to allegations in the charge, it is not a 'fishing expedition' that should be expected to extend to matters unrelated to the charge.

<u>Id.</u> at 464-65.

What is more, Furtado himself steered the MCAD away from any potential investigation into a failure to accommodate when he expressly stated that he "ha[d] not made a formal claim regarding the lack of a reasonable accommodation."  Rebuttal 7.  Even if the MCAD reasonably could have been expected in the natural course of its investigation to uncover evidence of the failure to reasonably accommodate, Furtado's express disavowal of any reasonable accommodation claim was sufficient grounds for the agency to cease or forego any investigation into that claim.  Furtado's statement also conveyed to the Defendants that the scope of their potential liability would not include a failure to accommodate claim.

Given the purposes of the administrative filing requirement and the parameters of the "scope of the investigation rule," the Court concludes that Furtado's reasonable accommodation claim under the ADA and Massachusetts General Laws chapter 151B is not reasonably within the scope of the MCAD investigation into his administrative charge.  Furtado having failed to raise the

reasonable accommodation issue with the MCAD, this Court is without jurisdiction over claims two and eight.

### b.   Substantive Claims

Even were jurisdiction proper, however, the Court notes that claims two and eight fail as matter of law.  Under the ADA, employers are required to reasonably accommodate an otherwise qualified employee with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on its business.  42 U.S.C. § 12112(b)(5)(A).  Here, Furtado sought the accommodation of being assigned to a day shift, which he argues would have decreased his anxiety by allowing him to spend more time with his young sons and to avoid working in the extremely small office space of Standard Parking's observation room.  Rebuttal 2, 7.

To survive a motion for summary judgment on a failure to accommodate claim, Furtado must demonstrate that: (1) he is disabled; (2) he was able to perform the essential functions of his job with or without a reasonable accommodation; and (3) Standard Parking had knowledge of his disability yet failed to provide a reasonable accommodation.  Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003).

Standard Parking does not appear to challenge the first two elements.  With regard to the third element, there is a factual dispute as to when Standard Parking became aware of Furtado's

disability.  The claims nonetheless fail as matter of law,
however, because Standard Parking did not avoid making a
reasonable accommodation.

### c.  Standard Parking's Knowledge

Although it is undisputed that Furtado did not provide
written documentation of his disability until July 2008, Furtado
argues that Standard Parking knew about his disability long
before this date.  Furtado argues that it is disingenuous for
Santiago, as his close friend, to claim that he did not know that
Furtado was suffering from significant psychological problems.
Pl.'s Mem. 3, 11-12.  Moreover, Furtado avers that, throughout
the year 2007 and up until July 2008, he had numerous discussions
with Santiago and Hajjar about the personal and emotional issues
he was having.  Furtado Aff. ¶¶ 7-8.  He also claims that during
this time he occasionally experienced physical shakes at work, of
which the Defendants were aware.  Id. ¶ 9.  That Standard Parking
knew about Furtado's emotional issues in 2007 (when Furtado
claims he began making accommodation requests) is further
supported by the comment on Furtado's January 2008 evaluation
that "[t]his year seems to have been a struggle with him between
his job and personal life."  2007 Evaluation 2.

Standard Parking argues that Furtado's statements to
Santiago and Hajjar about having a stressful child custody
situation and being depressed or "losing it" were too ambiguous

to have placed the company on notice of his disability.  Def.'s
Mem. 15; see Miller v. National Cas. Co., 61 F.3d 627, 629-30
(8th Cir. 1995) (ruling that statements by a family member that
the plaintiff-employee was "falling apart" and had "really lost
it" were inadequate to alert the employer to a disability
requiring accommodation under the ADA).

There is a genuine issue of material fact as to Standard
Parking's knowledge of Furtado's disability.  Summary judgment
for the Defendants is nonetheless proper, however, because the
accommodations sought were neither reasonable nor required under
federal or state law.

### d.  Reasonable Accommodation

The parties contest whether moving Furtado to a day shift
was a reasonable accommodation.[9]  Both parties understood that

---

[9] Furtado also argues that the Defendants have not met their
legal duty because they failed to engage in a meaningful dialogue
with him about a reasonable accommodation.  The ADA's regulations
note that "[t]o determine the appropriate reasonable
accommodation it may be necessary for the covered entity to
initiate an informal, interactive process with the individual
with a disability in need of the accommodation." 29 C.F.R.
§ 1630.2(o)(3).  State law imposes a similar requirement on
employers.  See Russell v. Cooley Dickinson Hosp., Inc., 437
Mass. 443, 457 (2002).
    The employer's burden, however, is not as onerous as Furtado
suggests.  The regulations' use of 'may' demonstrates that
Congress could have imposed an affirmative obligation upon
employers in all cases but chose not to.  Jacques v. Clean-Up
Grp., Inc., 96 F.3d 506, 51 (1st Cir. 1996).  In addition to
being advisory as opposed to mandatory, the interactive process
envisioned is informal and highly context-specific.  Finally, and
contrary to the tone of Furtado's arguments, courts have ruled
that the burden of fashioning a reasonable accommodation is not

Furtado could not keep his same position and work during the day because no such position existed.  Furtado, however, claims that he was happy to work any number of other jobs, even those below his pay scale, so long as they were during the daytime.

### (1)  Massachusetts General Laws chapter 151B

Massachusetts law does not require that an employer provide a reasonable accommodation in the form of reassignment to a new or different position.  Gauthier v. Sunhealth Specialty Servs., Inc., 555 F. Supp. 2d 227, 240 (D. Mass. 2008) (Saylor, J.).  Instead, Massachusetts General Laws chapter 151B requires only that the employer provide reasonable accommodation in the form of modifications to an employee's existing position.  See Russell v.

---

borne by the employer alone.  Instead, the "responsibility for fashioning a reasonable accommodation is shared between the employee and the employer."  Taylor v. Principal Financial Grp., Inc., 93 F.3d 155, 165 (5th Cir. 1996).

The goal of the interactive process is to identify the limitations resulting from the disability and any potential reasonable accommodation that could overcome those limitations.  29 C.F.R. § 1630.2(o)(3).  Here, there is a genuine dispute about the extent to which Standard Parking engaged in this interactive process.  This factual dispute is ultimately immaterial, however, because there is no evidence that any informal interactive process actually would have borne fruit.  See Jacques, 96 F.3d at 513.  For his part in the interactive process, Furtado contends that the only accommodation he ever requested was to move to a day shift so that he could spend time with his sons and be in a different work environment than the small observation room.  As discussed infra, the accommodation Furtado requested, and now asserts should have been provided, was neither reasonable nor required under Massachusetts General Laws chapter 151B, section 4(16).

<u>Cooley Dickinson Hosp.</u>, 437 Mass. 443, 454 (2002).  Unfortunately for Furtado, he was the manager of a nighttime shuttle service, and thus no modification (short of changing the entire Saferide program) would accommodate Furtado's disability while serving in this managerial position.  Under state law then, Standard Parking did not fail to provide a reasonable accommodation.

### (2)  The ADA

The ADA is more protective of employees than Massachusetts General Laws chapter 151B and requires that employers reassign employees to vacant positions as a form of reasonable accommodation.  42 U.S.C. § 12111(9)(B); <u>see</u> <u>Phelps</u> v. <u>Optima Health, Inc.</u>, 251 F.3d 21, 27 (1st Cir. 2001).  Employers are not, however, required to create a new job for an employee seeking reassignment; nor are they required to rearrange the schedules of other employees to accommodate the employee seeking reassignment.  <u>See</u> <u>Phelps</u>, 251 F.3d at 27.  An employee seeking reassignment bears the burden, at the summary judgment stage, of identifying a specific position (for which he was qualified) that was vacant at the time the request was made.  <u>Id.</u>

In attempting to meet this burden, Furtado provides job listings from September 2008 showing several available supervisory and non-supervisory positions.  Select Job Postings, ECF Nos. 23-2, 23-3.  These listings, however, fail to demonstrate that these positions were available during the time

30

period of 2007 to July 2008 when Furtado was requesting an accommodation.  Although it could be inferred that if there were at least four vacant positions in September 2008, there were likely also openings at some point in 2007 or early 2008, this is not enough to survive summary judgment on count two.

Because the accommodation requested by Furtado was neither reasonable nor required, he has failed to establish that Standard Parking was aware of his disability yet failed to provide a reasonable accommodation.  Summary judgment therefore properly is granted for the Defendants on Furtado's second and eight claims.

### 4.   Interference Under Massachusetts General Laws chapter 151B, section 4(4A)

To establish a claim for interference under Massachusetts General Laws chapter 151B, section 4(4A), Furtado must show that Santiago or Hajjar interfered with his rights under the statute in deliberate disregard of those rights.  <u>Canfield</u> v. <u>Con-Way Freight, Inc.</u>, 578 F. Supp. 2d 235, 242 (D. Mass. 2008) (Gorton, J.) (citing <u>Woodason</u> v. <u>Town of Norton Sch. Comm.</u>, No. 98-BEM-0624, 2003 WL 554332 *4 (M.C.A.D. Feb. 19, 2003)).  In cases based on circumstantial evidence of discrimination, individuals may be held liable if: (1) they had the authority or the duty to act on behalf of the employer; (2) their action or failure to act implicated rights under the statute; and (3) there is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant's

31

protected rights allowing the inference to be drawn that there was intent to discriminate or interfere with the complainant's exercise of his rights.

Here, it is uncontested that Hajjar and Santiago, as supervisors, had the authority to act on behalf of Standard Parking.  Furtado's interference claim nonetheless fails because he has not demonstrated that the actions of Santiago or Hajjar implicated his rights under the statute and because, even if Furtado were to have an arguable claim against Standard Parking, there is absolutely no evidence that Santiago or Hajjar had an intent to discriminate.

In his deposition, Furtado admitted that no one at Standard Parking ever said or did anything that would suggest they had a bias against disabled persons.  Furtado Dep. 162:8-12.  Moreover, when asked whether he had any knowledge that Santiago or Hajjar knew they were doing something illegal, Furtado acknowledged that he "d[id]n't know what [they] were thinking."  Id. at 165:15-22.

Absent evidence that Santiago or Hajjar acted in deliberate disregard of Furtado's rights, Furtado's ninth cause of action, against the individual defendants for interference under Massachusetts General Laws chapter 151B, section 4(4A), cannot survive.

### 5.   Aiding and Abetting Under Massachusetts General Laws chapter 151B, section 4(5)

Section 4(5) of chapter 151B prohibits "any person, whether

an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so." Mass. Gen. Laws ch. 151B, § 4(5). An individual may be held separately liable if he actively perpetrates or assists another in acts prohibited by chapter 151B. <u>Murray</u> v. <u>Sharp Air Freight Servs., Inc.</u>, No. 975878J, 2000 WL 33170935, at *4 (Mass. Super. Ct. Dec. 5, 2000) (Fremont-Smith, J.). A claim of aiding and abetting is wholly derivative of the underlying discrimination claim – which Furtado has failed to substantiate – and thus this claim must also fail. <u>Abramian</u> v. <u>President & Fellows of Harvard Coll.</u>, 432 Mass. 107, 122 (2000). Moreover, as with a claim for interference, a claim of aiding and abetting requires showing a defendant's intention to provide substantial, supporting assistance to intentional conduct in violation of the Massachusetts General Laws chapter 151B. <u>Planned Parenthood League of Mass., Inc.</u> v. <u>Blake</u>, 417 Mass. 467, 481 (1994); <u>Kyte</u> v. <u>Philip Morris Inc.</u>, 408 Mass. 162, 168 (1990). As Furtado fails to provide any evidence of intent or knowledge on the part of Santiago or Hajjar, his claim for aiding and abetting must be dismissed.

### C.   Claims Under the FMLA

Furtado alleges that the Defendants violated the FMLA, 29 U.S.C. § 2601, by retaliating against him for seeking leave and by denying him his entitlement to return to his job after taking

leave.  Compl. ¶¶ 56-66.  The FMLA recognizes two types of claims
for alleged violations of the Act: (1) retaliation claims, in
which employers discharge employees for exercising their FMLA
right to take leave, <u>see</u> 29 U.S.C. § 2615(a)(1); and (2)
interference claims, in which employers burden or outright deny
substantive statutory rights to which their employees are
entitled, <u>see</u> <u>id.</u> § 2615(a)(2).  <u>O'Connor</u> v. <u>PCA Family Health
Plan, Inc.</u>, 200 F.3d 1349, 1352 (11th Cir. 2000).

### 1.  Retaliation

To make out prima facie case for retaliation under the FMLA,
Furtado must demonstrate that: (1) he availed himself of a
protected right under the FMLA; (2) he was adversely affected by
an employment decision; and (3) he was treated less favorably
than an employee who had not requested leave under the FMLA, or
the adverse decision was made because he sought protection under
the FMLA.  <u>Edwards</u> v. <u>Community Enters., Inc.</u>, 251 F. Supp. 2d
1089, 1103 (D. Conn. 2003).

The crux of the dispute lies in the third element.  Furtado
does not need to prove that retaliation was the only reason for
his termination; he may establish an FMLA retaliation claim by
showing that the protected conduct was a substantial or
motivating factor in the employer's decision.  <u>Goelzer</u> v.
<u>Sheboygan Cnty., Wis.</u>, 604 F.3d 987, 995 (7th Cir. 2010).  It is
here that Furtado fails to substantiate his claims.

34

In evaluating whether Furtado was terminated because he
sought protection under the FMLA, the Court must again look at
the causal relationship.  The analysis of causation with regard
to this claim, however, is slightly different than that for
Furtado's discrimination claim under the ADA: the causal event
here is not Furtado's request to move to a day shift but rather
his request to take leave on July 7 or July 8, 2008.  This event
took place square in the middle of his alleged misuse of the
company-issued cell phone.  The timeline is undisputed: Furtado
was suspended from June 21 to June 23 for cell phone overuse; on
June 28, Furtado was placed on a ninety-day probationary period;
Furtado approached Santiago and asked for leave under the FMLA on
July 7 or July 8; Furtado took two weeks off from work, beginning
on July 13; on July 21, MIT told Santiago that Furtado had again
overused his cell phone for the period of June 4 to July 3, 2008;
Furtado was fired on July 24.  This timeline eviscerates the
causation element because Standard Parking had already taken an
adverse employment action (suspension and probation) against
Furtado <u>before</u> he ever asked for leave.  Furtado therefore fails
to establish that the adverse decision was made because he sought
protection under the FMLA.  As discussed above, Furtado also
fails to present any evidence that he was treated less favorably
than an employee who had not requested leave under the FMLA.

Furtado has not met his burden to show that his request for

leave was a substantial or motivating factor in the Defendants'
decision to terminate his employment.  The Court therefore grants
summary judgment for the Defendants on Furtado's fourth claim,
i.e., retaliation under the FMLA.

### 2.  Interference

Furtado claims that the Defendants unlawfully denied him the
rights and benefits of FMLA leave by terminating his employment
before his return to work.  To survive summary judgment, he must
demonstrate that: (1) he was an "eligible employee" under the
FMLA; (2) Standard Parking was a "covered employer" under the
FMLA; (3) he gave Standard Parking adequate notice of his request
for protected leave; (4) for a covered reason; and (5) he was not
returned to an equivalent position at the end of his leave.  Id.
at 993.  The parties dispute only one element of this matrix;
viz., whether Standard Parking lawfully could have terminated
Furtado even though he was on leave at the time.

If termination would have occurred regardless of the request
for FMLA leave, an employee may be terminated even if termination
prevents him from exercising his rights under the FMLA.  Bones v.
Honeywell Int'l, Inc., 366 F.3d 869, 877 (10th Cir. 2004).  "A
reason for dismissal that is unrelated to a request for an FMLA
leave will not support recovery under an interference theory."
Id.  As discussed above, Furtado merely speculates that his
termination was related to his request for FMLA leave as opposed

to his excessive cell phone charges.  Being on leave does not
insulate an employee from being terminated for misconduct.
Because Furtado has failed to raise a genuine issue of material
fact as to the causal relationship between his request for leave
and his subsequent termination, the Court must enter summary
judgment for the Defendants on count five.

### D.   Promissory Estoppel Claim

Finally, Furtado brings a claim for promissory estoppel
against Standard Parking, alleging that he relied on the
company's implicit promise that, under the FMLA, he would be able
to return to the same position after his two-week vacation.  Id.
¶¶ 67-72.  This argument, however, would essentially eliminate
the concept of at-will employment for employees covered under the
FMLA.  Although Furtado, and all employees, are entitled to the
protection of being returned to their position after leave
properly taken under the FMLA, this does not immunize employees
from termination or guarantee their perpetual employment.
Because there is here no unambiguous promise of continued
employment for at-will employees, like Furtado, his sixth claim
fails as matter of law.  The Court therefore grants summary
judgment in favor of the Defendants on count six.

## III.   CONCLUSION

For the foregoing reasons, the Defendants' motion for
summary judgment, ECF No. 15, is ALLOWED as to all counts of the

complaint.

**SO ORDERED.**

/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE